UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DUNKIN' DONUTS FRANCHISED
RESTAURANTS LLC, et al.,

        Plaintiffs,

v.                                  CASE NO. 8:09-CV-131-T-17MAP

KEV ENTERPRISES, INC.,
et al.,

        Defendants.

_____/

ORDER

This cause is before the Court on:

Dkt. 6    Motion for Preliminary Injunction
Dkt. 14   Opposition
Dkt. 15   Declaration - Patel
Dkt. 16   Declaration - Furash
Dkt. 30   Reply
Dkt. 27   Motion for Preliminary Injunction
Dkt. 33   Opposition
Dkt. 34   Declaration - Furash
Dkt. 38   Reply
Dkt. 39   Notice - Exhibits

        The First Amended Complaint (Dkt. 29) in this case includes
the following: 1) Count I - Breach of Franchise Agreements; 2)
Count II - Breach of Franchise Agreements; 3) Count III -
Trademark Infringement; 4) Count IV - Unfair Competition; and
Count V - Trade Dress Infringement. Plaintiffs seek an
injunctive order ratifying and enforcing the termination of the
Franchise Agreements as of the effective date contained in the
Notices of Termination, a judgment in favor of Plaintiff for

damages incurred by them as a result of the breaches of the Franchise Agreements; an injunction enjoining Defendants and those acting in concert with them from infringing upon Plaintiffs' trademarks, trade dress and trade names, and from otherwise engaging in unfair competition with Plaintiffs, an injunctive order directing Defendants to comply with their post-termination obligations as provided in the Franchise Agreements, an award of damages against Defendants for the damages sustained by Plaintiffs and the profits Defendants have derived as a result of their actions and treble damages in accordance with Section 35 of the Lanham Act, an award of prejudgment interest in accordance with Section 35 of the Lanham Act, punitive damages as appropriate because of the willful, intentional and malicious nature of Defendants' conduct, and the award of attorney's fees and costs pursuant to contract and Section 35 of the Lanham Act.

Plaintiffs Dunkin' Donuts and Baskin-Robbins have filed two Motions for Preliminary Injunction. In the first Motion (Dkt. 6), Plaintiffs move for a preliminary injunction against their former franchisees, Defendants KEV Enterprises, Inc. and Mary Furash, because, despite explicit provisions in the Franchise Agreements (Exhs. A-1, A-2, Dkts. 6-3, 6-4) requiring Defendants to maintain a sufficient supply of ice cream products and other Baskin-Robbins products, Defendants have failed to offer any ice cream for sale. Plaintiffs also contend that Defendants' sole shareholder, Defendant Mary Furash, has failed to devote her best efforts to manage and operate the shops, in that Defendant Mary Furash has moved out of state and effectively abandoned the shops. Defendants have also failed to take a required training course to address certain operational standards. Plaintiffs argue that, despite receiving notices for the above defaults,

Defendants have not timely cured the defaults in accordance with the Franchise Agreements. Plaintiffs have served termination notices on Defendants, but Defendants continue to operate the shops and hold themselves out as franchisees of Plaintiff. Plaintiffs seek a preliminary injunction to prohibit Defendants from continuing the unauthorized use of Plaintiffs' trademarks, trade name, and trade dress.

In the second Motion for Preliminary Injunction (Dkt. 27), Plaintiffs seek a preliminary injunction because Defendants have not paid required franchise fees and advertising fees to Plaintiffs pursuant to the Franchise Agreements. Plaintiffs contend that, despite receiving written notice and an opportunity to cure the defaults, Defendants have not paid the required fees, and continue to use Plaintiffs' proprietary marks without a license to do so. Plaintiffs seek immediate injunctive relief to enjoin Defendants' infringing activities, to bar Defendants from their continued unlicensed use of the Plaintiffs' proprietary marks in violation of the Lanham Act, and to require Defendants to comply with their post-termination obligations.

I. Standard of Review

To be entitled to a preliminary injunction, a plaintiff must demonstrate that: 1) it has a substantial likelihood of success on the merits; 2) that it will suffer irreparable injury unless the injunction issues; 3) the injury to it outweighs any injury that the injunctions's issuance would have on the opposing party, and 4) if issued, the injunction will not disserve the public interest. <u>This That and The Other Gift And Tobacco, Inc. v. Cobb</u>

County, 285 F.3d 1319, 1321-1322 (11th Cir. 2002).

II.  Statement of Facts

1.  Plaintiff Dunkin' Donuts Franchised Restaurants LLC is engaged in the business of franchising independent businesspersons to operate Dunkin' Donuts shops in the United States.

2.  Dunkin' Donuts franchisees are licensed to use the trade names, service marks, and the trademarks of Dunkin' Donuts and to operate under the Dunkin' Donuts system, which involves the production, merchandising, and sale of doughnuts and related products utilizing a specifically designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and information.

3.  Dunkin' Donuts is a franchisor of the Dunkin' Donuts franchise system.

4.  Plaintiff DD IP Holder LLC is the owner of the trademark, service mark, and trade name "Dunkin' Donuts," and related marks.  Dunkin' Donuts has a license to use and license others to sue these marks and trade name and along with its predecessors has used them continuously since approximately 1960 to identify its doughnut shops , and the doughnuts, pastries, coffee, and other products associated with those shops.

5.  Plaintiff DD IP Holder LLC owns numerous federal registrations for the mark Dunkin' Donuts, and related marks. Each of these registrations is in full force and effect, and is

4

incontestable, pursuant to 15 U.S.C. Sec. 1065.

6. The Dunkin' Donuts marks have been widely advertised and promoted by Dunkin' Donuts. Between 1971 and 2007, Dunkin' Donuts and its franchisees spent over $1,925,000,000 on advertising and promoting the Dunkin' Donuts marks. As a result, Dunkin' Donuts marks have become famous throughout the United States.

7. Dunkin' Donuts and its franchisees currently operate approximately 5,600 shops in the United States, and 2,000 outside the United States. Dunkin' Donuts shops feature Dunkin' Donuts distinctive trade dress, including the pink and orange color scheme, and the frankfurter lettering style. Since 1960, Dunkin' Donuts shops have served millions of consumers.

8. As a result of the sales, advertising and promotion of items identified by the Dunkin' Donuts marks, the public has come to know and recognize the Dunkin' Donuts marks, and to associate them exclusively with products and services offered by Dunkin' Donuts and its franchisees. The Dunkin' Donuts marks are widely known trademarks, and are assets of inestimable value to Dunkin' Donuts, representing and embodying Dunkin' Donuts considerable goodwill and favorable reputation.

9. The goodwill and reputation associated with Dunkin' Donuts marks are impaired when a franchisee fails to maintain standards.

10. Plaintiff Baskin-Robbins Franchised Shops LLC is engaged in the business of franchising independent

businesspersons to operate Baskin-Robbins stores throughout the United States.

11. Baskin-Robbins franchisees are licensed to use the trade names, service marks, and trademarks of Baskin-Robbins and to operate under the Baskin-Robbins system, which involves the production, merchandising, and sale of ice cream and related products utilizing special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and information.

12. Baskin-Robbins is a franchisor of the Baskin-Robbins System.

13. Plaintiff BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks. Baskin-Robbins has a license to use and license others to use these trademarks and trade names and along with its predecessors has used them continuously since approximately 1950 to identify its ice cream stores, and the ice cream and other products associated with those stores.

14. BR IP Holder LLC owns numerous federal registrations for the mark "Baskin-Robbins" and related marks.

15. The Baskin-Robbins marks have been widely advertised and promoted by Baskin-Robbins over the years. Baskin-Robbins has expended many millions of dollars in advertising and promoting the Baskin-Robbins marks over the past fifty years. As a result, the Baskin-Robbins marks have become famous throughout

6

the United States.

16. Baskin-Robbins and its franchisees operate approximately 2,500 stores in the United States and 3,000 outside the United States. Since 1950, Baskin-Robbins shops have served millions of consumers.

17. As a result of the sales, advertising and promotion of items identified by the Baskin-Robbins marks, the public has come to know and recognize the Baskin-Robbins marks, and to associate them exclusively with products and services offered by Baskin-Robbins and its franchisees. The Baskin-Robbins marks are widely known trademarks, and are assets of inestimable value to Baskin-Robbins, representing and embodying Baskin-Robbins' goodwill and favorable reputation.

18. The goodwill and reputation associated with the Baskin-Robbins trademarks and trade names are impaired when a franchisee fails to maintain standards and operate their shops in compliance with Baskin-Robbins' standards and system requirements.

19. Dunkin' Donuts Franchised Restaurants LLC and Baskin-Robbins Franchised Shop LLC operate as separate corporations, but they pursue or permit joint development of units in selected markets, which are commonly referred to as "combo" shops.

20. Defendants were Dunkin' Donuts and Baskin-Robbins franchisees for combination doughnut and ice cream shops located at 5605 Manatee Avenue West, Bradenton, Florida, and 5635 14th Street West, Bradenton, Florida, pursuant to Franchise Agreements dated February 23, 2005.

7

21.    Under the terms of the Franchise Agreements, Defendants agreed Defendants would use Dunkin' Donuts and Baskin-Robbins' proprietary marks, including, but not limited to, their trademarks, logos, emblems, trade dress and other indicia or origin, "only in the manner and to the extent specifically licensed" by the Franchise Agreements. (Pars. 7.0, 7.1).

22.    Defendants agreed to operate the shops in accordance with the standards of Dunkin' Donuts and Baskin Robbins, "in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons."  Defendants agreed "to devote continuous best efforts to successfully develop, manage and operate the [shops]...and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole."  (Par. 5).

23.    Par. 5.1.8 of the Franchise Agreements requires Defendants to manage the shops "at all times with at least two (2) individuals, one of whom must be the FRANCHISEE, or a partner, shareholder or member of FRANCHISEE..." (Par. 5.1.8).

24.    Defendants agreed to "maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE'S customers at the Unit."  (Par. 5.1.4)

25.    Defendants agreed "carry out the business covered by this Agreement in accordance with the operational Standards established by the FRANCHISOR..." (Par. 5.1.1).

26. Defendants agreed that Defendants, or their designated representative, would attend such training as Dunkin' Donuts and Baskin-Robbins "shall from time to time reasonably require." (Par. 5.1.8.2).

27. Defendants agreed that they would not do or perform, directly or indirectly, any act injurious or prejudicial to the goodwill associated with Plaintiffs' proprietary marks and their systems. (Par. 8.0.1).

28. The Franchise Agreement each contain a "cross default" provision, which states that "Franchisee shall be in default under this Agreement...[i]f any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder...." (Par. 9.0.4).

29. Defendants agreed that upon the termination of the Franchise Agreements, their rights to use Plaintiff's proprietary marks and systems would cease. (Pars. 9.4, 9.4.1,9.4.2,9.4.3).

30. Defendants agreed that any unauthorized use of Plaintiffs' proprietary marks following the effective date of the termination of the Franchise Agreements would result in irreparable harm to Dunkin' Donuts and Baskin-Robbins and would constitute willful trademark infringement. (Par. 9.4.3).

31. In March, 2008, Plaintiffs learned that Defendants' designated representative, Mary Furash, was not devoting her time to managing and operating the shops. On March 17, 2008, Plaintiffs served a Notice of Default and Notice to Cure on Defendants, asking that Defendants cure their default within

9

thirty days of receipt, as required by the Franchise Agreements. Defendants did not cure the default. On October 29, 2008, Plaintiffs served Defendants with a Notice of Termination.

32. In October, 2008, Plaintiffs learned that Defendants did not meet certain operating standards (Dkts. 6-11, 6-12). After an inspection, Operations Compliance Manager Jon C. Jones instructed Defendants to take a training course designed to address the operational defaults. Defendants did not take the training course.

33. On November 11, 2008, Plaintiffs served Defendants with a Supplemental Notice of Default/Notice to Cure, requiring Defendants to take the required training course within thirty days of receipt of the Notice. Defendants did not take the training course. On January 13, 2009, Plaintiffs served Defendants with a Notice of Termination for failure to cure this default. (Dkt. 6-2).

34. On December 10, 2008, Plaintiffs inspected Defendants' shops, which revealed that Defendants did not maintain a sufficient supply of ice cream products and other Baskin-Robbins products for sale to customers. (Dkt. 6-11). On December 15, 2008, Plaintiffs served Defendants with a Supplemental Notice of Default and Notice to Cure, requesting that Defendants cure the defaults within thirty days. (Dkt. 6-2).

35. On January 14, 2009, Plaintiffs inspected Defendants' shops, and learned that Defendants did not cure the defaults. (Dkt. 6-11). Defendants had no ice cream at all in the stores. On January 26, 2009, Plaintiffs served Defendants with a

10

Supplemental Notice of Termination, terminating Defendants'
Franchise Agreements immediately upon their receipt of the
Supplemental Notice, stating the grounds for termination, and
demanding that Plaintiffs comply with post-termination
obligations as set forth in the Franchise Agreements.

36. The terms of the Franchise Agreements include payment
of franchise fees and advertising fees by Defendants (Dkt. 6-3,
Dkt. 6-4). In the event Defendants do not pay the franchise fees
and advertising fees in a timely manner, Defendant are entitled
to a written notice of default and seven (7) days to cure the
financial default.

37. Upon termination of the Franchise Agreements,
Defendants agreed their right to use Plaintiffs' proprietary
marks and systems would cease and that any use of Plaintiffs'
marks' after termination would constitute irreparable harm
subject to injunctive relief. (Dkts. 6-3, 6-4, Pars. 7.1,9.4,
9.4.1,9.4.2,9.4.3).

38. Defendants have not paid franchise fees and advertising
fees due for both shops. As of January 15, 2009, Defendants owed
Plaintiffs $20,917.29 in unpaid franchise fees, advertising fees
and other charges for the Manatee Avenue shop. As of January 15,
2009, Defendants owed Plaintiffs $13,033.57 in unpaid franchise
fees, advertising fees and other charges for the 14th Street
shop. (Dkt. 27-2).

39. On January 15, 2009, Plaintiffs served Notices to Cure
on Defendants for the financial defaults. Plaintiffs provided
Defendants fifteen (15) days to cure the defaults. (Dkt. 27-7).

11

40. Defendants did not cure the financial defaults with the fifteen (15) days provided in the Notice to Cure.

41. As of March 12, 2009, Defendants still owed Plaintiffs $11,560.20 in unpaid franchise fees, advertising fees and other charges for the Manatee shop, and $6,651.76 in unpaid franchise fees, advertising fees, and other charges for the 14th Street shop. Defendants now owe further monies for both shops.

42. On March 12, 2009, Plaintiffs sent Defendants a Supplemental Notice of Termination, terminating the Franchise Agreements based on the non-payment of fees, demanding that Defendants cease using Plaintiffs' trade names and proprietary marks upon receipt of the Supplemental Notice, and comply with Defendants' post-termination obligations under the Franchise Agreements.

43. Defendants have refused to accept termination and continue to operate as if Defendants were licensed Dunkin' Donuts and Baskin-Robbins franchisees.

IV. Discussion

A preliminary injunction is an extraordinary and drastic remedy which is not to be granted unless the movant clearly establishes the 'burden of persuasion' as to each of the...prerequisites. See Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000)(citing McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998). The grant of a preliminary injunction is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion. Id. at 1180.

12

Where an injunction turns on the resolution of bitterly disputed facts...an evidentiary hearing is normally required to decide credibility issues. McDonald's Corp. v. Robertson, supra, at 1311. However, where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, courts generally need not hold an evidentiary hearing. Id. at 1313.

A. Likelihood of Success

Plaintiffs argue that Plaintiffs are likely to succeed on the merits of Plaintiffs' breach of contract claim, trademark infringement claim, trade dress infringement claim, and unfair competition claim.

As to the breach of contract claim, Plaintiffs argue that the evidence clearly shows that Defendants have received written notice of defaults, and Defendants have not cured the defaults. Defendants argue that each breach provides a separate and independent basis to terminate Defendants' Franchise Agreements. Defendants also argue that the failure to pay financial obligations is a default, which, if not timely cured, allows for immediate termination of the Franchise Agreements.

Plaintiffs argue that the Franchise Agreements were properly terminated, and Defendants have refused to comply with their post-termination obligations under those Agreements.

Plaintiffs further argue that, because Plaintiffs are likely to succeed on Plaintiffs' termination claims, Plaintiffs are also likely to succeed on their trademark infringement claims.

Plaintiffs also argue that Plaintiffs are likely to succeed on their unfair competition claim and trade dress infringement claim.

Defendants respond that the alleged breaches of the Franchise Agreements have either been waived by Plaintiffs, or manufactured to effectuate the termination. Defendants argue that Plaintiffs have not demonstrated the substantial likelihood of success on the merits of the Lanham Act claims. Defendants argue that Defendants continue to operate the Stores under a framework created by Plaintiff that recognizes the right of terminated franchisees to continue to operate post-termination.

Defendants argue that Plaintiffs have not demonstrated the substantial likelihood of success on the merits or irreparable harm, and therefore the Motion for Preliminary Injunction must be denied.

1. Controlling law

The Court notes that the Franchise Agreements provide that the resolution of all disputes between the parties shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles. (Dkt. 6-3, 6-4, Par. 11.3). To establish a breach of contract claim under Massachusetts law, a plaintiff must show that: 1) the parties reached a valid and binding agreement; 2) defendant breached the terms of the contract, and 3) plaintiff suffered damages from the breach. Coll v. PB Diagnostic Sys., 50 F.3d 1115, 1122 (1st Cir. 1995).

14

2. Contract issues

a) Authenticity of Contracts

Defendants contend that the contracts attached to Plaintiffs' Motion are not the true Franchise Agreements. Defendants have attached pages from different contracts to the Declaration of Stanley Furash (Dkt. 16-2). The contracts Defendants identify as the true Franchise Agreements contain many "blank" terms, including date, initial franchise fee, marketing start-up fee, address for notice to Franchisee, and Designated Representative.

In looking at the signature of the Franchisor, the signature line unmistakably contains the signature of the Franchisee, Mary Furash, which is crossed out, rather than the signature of a representative of the Franchisor, Baskin-Robbins USA Co. and Dunkin' Donuts Incorporated. The second "Franchise Agreement" does not include a signature page.

After consideration, the Court finds that the "Franchise Agreements" provided by Defendants are not contracts, in that key terms are not included, and the Agreements are not signed by Plaintiffs' authorized representative. Defendants' challenge to the authenticity of the Franchise Agreements, which are attached to Plaintiffs' Motion for Preliminary Injunction, is not a genuine challenge requiring resolution at an evidentiary hearing. The Court concludes that the complete Franchise Agreements proffered by Plaintiffs, which are accompanied by the certification of Jack Loudermilk, Associate General Counsel for Dunkin' Donuts Franchised Restaurants LLC and Baskin-Robbins

15

Franchised Shops LLC, and custodian of franchise records (Dkt. 6-2), are the true Franchise Agreements.

b) Failure to Pay Fees

Section 4 of the Franchise Agreements at issue details the payments due to Plaintiff from Defendants. Section 9 of the Franchise Agreements addresses default and termination of the Franchise Agreements, and the procedure to cure defaults. In Defendants' Opposition (Dkt. 33, p. 2), Defendants state that:

> "Since January 2008, Defendants have not timely paid their franchise and advertising fees in the manner provided in the Franchise Agreements."

On January 19, 2009, Plaintiffs served Defendants with Notices to Cure the payment defaults, giving Defendants fifteen days to cure the defaults (Dkts. 27-8, 27-9). It is undisputed that Defendants did not cure the defaults. Plaintiffs served a Supplemental Notice of Termination on March 12, 2009 (Dkt. 27-10).

In Par. 9.4, the Franchise Agreements provide:

> 9.4 Termination. If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR. Notwithstanding the foregoing, this Agreement shall immediately terminate

16

upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice of opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate....

Defendants respond that Plaintiffs have waived their right to terminate the Franchise Agreements based on the alleged failure to pay franchise and advertising fees.

The Court notes that the Franchise Agreements provide:

13.0  Non-Waiver.  Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE, with any term, covenant, or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement.  Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE.  Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE

17

>                    and not as recognition of such person or
>                    entity as an assignee of or successor to
>                    FRANCHISEE.

The Court further notes that the various notice letters to
Defendants to cure weekly financial defaults for nonpayment or
bounced checks specifically state that Plaintiffs do not waive
Plaintiffs' rights relating to any prior Notice of default (Dkt.
39). The Notices of Termination also include an anti-waiver and
anti-acquiescence provision.

"Under Massachusetts law, the burden of proving waiver is
upon the party who makes the assertion. In order to establish
waiver, the party must show clear, decisive and unequivocal
conduct indicating the opposing party would not insist that the
contractual provision at issue be performed." See Brennan v.
Carvel Corp., 929 F.2d 801, 810 (1st Cir. 1991). This is an
"uncompromising standard." See Paterson-Leitch co. v. Mass Mun.
Wholesale Elec. Co., 840 F.2d 985, 992 (1st Cir. 1988). In light
of the reservation of Plaintiffs' rights in the notice letters,
and Defendants agreement to the Non-Waiver provision of the
Franchise Agreements, the acceptance of late payments from
Defendants does not establish Plaintiffs' waiver.

The Court further notes that the Franchise Agreements are
integrated contracts which require written consent to
modification (Dkt. 6-3, Par. 15). The parties' subsequent
course of conduct is not sufficient to modify the terms of the
Franchise Agreements. Even if the parties' course of conduct
were sufficient to establish modification of the Franchise
Agreements, Defendants identify no consideration for the
modification.

Defendants have argued that the breaches of contract alleged by Plaintiffs have been manufactured to effectuate termination. The Eleventh Circuit Court of Appeals has held that a franchisor's motive for termination is irrelevant where there has been a material breach of the franchise agreement sufficient to justify termination of the agreement. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1309 (11th Cir. 1998).

Failure to make payments called for under a contract constitutes a breach going to the root of the contract. Petrangelo v. Pollard, 255 N.E.2d 342, 345 (1970). The Affidavit of Sandra Richmond (Dkt. 27-2), which is uncontroverted, establishes the amounts Defendants failed to pay under the Franchise Agreements.

Defendants' financial defaults which were not cured within the applicable cure period constitute an independent basis for termination of both Franchise Agreements. The lawful termination of both Franchise Agreements triggers termination of Defendants' right to use Plaintiffs' Proprietary Marks and System, as well as the operation of both shops. After consideration, the Court concludes that Plaintiffs have established the likelihood of success on the breach of contract claim based on Defendants' financial defaults.

c) Other Breaches

Plaintiffs asserted other breaches of contract in Plaintiffs' initial Motion for Preliminary Injunction. Plaintiffs requested a preliminary injunction because Defendants have not maintained a sufficient supply of Baskin-Robbins

19

products in the shops, and because Defendants' shareholder, Mary Furash, has not devoted her best efforts to manage and operate the shops, and failed to take a required training course.

There are material factual disputes as to the above issues which require resolution after a hearing. Because the Court has concluded that entry of a preliminary injunction is appropriate based on Defendants' financial defaults, it is not necessary for the Court to resolve these additional grounds for termination of the Franchise Agreements at this time.

3. Lanham Act Claims

To prevail on a trademark infringement claim under Section 32 of the Lanham Act, Plaintiffs must show that their trademark is valid and that Defendants have used the mark in a way that is likely to confuse consumers. Dieter v. B & H Inds. of Southwest Fla., Inc., 880 F.2d 322, 326 (11th Cir. 1989). To prove a violation of Section 43 of the Lanham Act for trade dress infringement, Plaintiffs must establish that "the trade dress of the two products is confusingly similar, that the features of the trade dress are primarily non-functional, and that the trade dress has acquired secondary meaning." John H. Harland Co. V. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983)(citations omitted). Unfair competition also "calls on the plaintiff to show confusing similarity between the services." Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1186 (11th Cir. 1985).

Plaintiffs' trademarks have been properly registered in compliance with the Lanham Act. (Dkt. 6-2). The validity of the trademarks is conclusively presumed. Dieter, supra, at 326.

Plaintiffs' trade dress, which includes a distinctive lettering style and color scheme, is non-functional in nature. After using the same distinctive trade dress at thousands of locations for years, and expending millions of dollars advertising and promoting the same, it is undisputable that Plaintiffs' trade dress has acquired secondary meaning.

Plaintiffs have directed Defendants to cease using Plaintiffs' trademarks and trade dress, but Defendants have continued to operate Defendants' two shops, as if Defendants are still licensed franchisees. In McDonald's Corp. v. Robertson, 147 F.3d 1301, 1309 (11th cir. 1998), the Eleventh Circuit held that this conduct creates "a certainty of confusion" among consumers that the terminated franchisee's products are actually the certified products of the franchisor.

After consideration, the Court concludes that Plaintiffs have established a substantial likelihood of success on Plaintiffs' infringement and unfair competition claims.

B. Irreparable Injury

Plaintiffs argue that Defendants' continued use of Plaintiffs' trademarks, trade dress and methods has caused and continues to cause irreparable harm.

The Eleventh Circuit has stated that "a sufficiently strong showing of confusion [caused by trademark infringement] may by itself constitute a showing of...[a] substantial threat of irreparable harm." Robertson, supra, at 1310. "By its very nature, trademark infringement results in irreparable harm

21

because the attendant loss of profits, goodwill and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated." <u>Societe Des Produits Nestle, S.A.</u>, 982 F.2d 633, 640 (1st Cir. 1992). The Court further notes that Par. 7.1 of the Franchise Agreements provides:

> 7.1 FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by the Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

(Dkt. 6-3, p. 12).

After consideration, the Court concludes that Plaintiffs have established a substantial threat of irreparable injury if the preliminary injunction is not issued.

C. Balance of Harm

The Court must determine whether the threatened injury to Plaintiffs outweighs whatever damage an injunction might cause the Defendants. In this case, the inquiry is whether the probable loss of consumer goodwill outweighs Defendants' losses arising from their inability to sell Defendants' products using the trademark until a decision on the merits.

When faced with similar factual situations in which a

franchisee has breached the terms of its franchise agreement, other courts have found that a franchisee cannot complain of harm from an injunction preventing further use of the franchisor's trademarks. See S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 379 (3rd Cir. 1992); Burger King v. Majeed, 805 F.Supp. 994, 1006 (S.D. Fla. 1992).

While the Court recognizes that Defendants will sustain financial losses if a preliminary injunction issues, that harm is the result of Defendants' failure to comply with the requirements of the Franchise Agreements. Weighing Defendants' self-inflicted injury against Plaintiffs' immeasurable losses to its hard-earned goodwill, the Court finds the balance of harms weighs decisively in favor of granting the requested relief.

D. Public Interest

A preliminary injunction in this case "is not adverse to the public interest, because the public interest is served by preventing consumer confusion in the marketplace." Davidoff & Cie, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001).

For the reasons stated above, Plaintiffs' request for a preliminary injunction preventing Defendants from further unauthorized use of Plaintiffs' trademarks and trade dress, is granted. Defendants are directed to comply with their post-termination obligations. Accordingly, it is

**ORDERED** that the Motion for Preliminary Injunction (Dkt. 6) is **denied** without prejudice. The Motion for Preliminary Injunction (Dkt. 27) is **granted.** Defendants KEV ENTERPRISES INC. and MARY FURASH, their agents, employees, representatives, and all persons acting in concert with them or under their control, are hereby preliminarily enjoined from:

1. Using or displaying Dunkin' Donuts and Baskin-Robbins trademarks or service marks, or any other logos, symbols or trade dress of Dunkin' Donuts and Baskin-Robbins, or any confusingly similar trademarks, service marks, logos, symbols or trade dress, in connection with the advertising, distribution, display or sale of any product or service; and

2. Making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Defendants or Defendants' shops are in any manner, directly, or indirectly, associated, affiliated, or connected with, or licensed, sponsored or approved by Dunkin' Donuts and Baskin-Robbins.

3. Upon receipt of this Preliminary Injunction, Defendants shall confer with Plaintiffs as to a practicable means of compliance with all post-termination obligations included in the Franchise Agreement, such as the return of proprietary materials, operating manuals and the like.

4. Plaintiff shall post a bond in the amount of $15,000 as security.

5. Defendants are directed to file and serve within thirty days after entry of this preliminary injunction a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with this preliminary injunction.

Case No. 8:09-CV-131-T-17MAP

**DONE and ORDERED** in Chambers, in Tampa, Florida on this
5th day of June, 2009.

ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record

25